| | | |
|---|---|---|
| LEE ALAN HARPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:12-cv-0257 |
| v. | ) | Judge Nixon/Brown |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**To: The Honorable John T. Nixon, Senior United States District Judge**

## REPORT AND RECOMMENDATION

This action was brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c) to obtain judicial review of the final decision of the Social Security Administration (the "SSA"), through its Commissioner ("the Commissioner"), denying Plaintiff's applications for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i), 423(d), and supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1382, 1382c. For the reasons explained below, the Magistrate Judge **RECOMMENDS** that Plaintiff's Motion for Judgment on the Administrative Record (DE 12) be **DENIED** and the Commissioner's decision be **AFFIRMED**.

## I.  PROCEDURAL HISTORY

This is the second time that Plaintiff has applied for and been denied social security benefits. Plaintiff first applied for DIB and SSI in 2005, claiming he was unable to work due to his epilepsy, learning disability, diabetes, and hip injury. (DE 10, pp. 120-127, 394-397).[1] The

---

[1] Page citations refer to the Bates Stamp on each page of the Administrative Record.

Commissioner denied Plaintiff's previous DIB and SSI applications on January 4, 2006. (DE 10, pp. 409-413).

At issue is Plaintiff's second application for DIB and SSI, filed June 30, 2008. (DE 10, pp. 10, 61-62). Disability Determination Services ("DDS") rejected Plaintiff's second request on November 5, 2008 and denied Plaintiff's reconsideration request on December 10, 2008. (DE 10, pp. 63-65, 69-83). On February 3, 2009, Plaintiff timely requested a hearing before an administrative law judge ("ALJ"). (DE 10, pp. 84-85).

Plaintiff's hearing took place on July 9, 2010 before ALJ David Mason Jr. (DE 10, p. 25). Also present were David Downard ("Mr. Downard"), Plaintiff's attorney, and Gary Sturgill, a Vocational Expert ("VE"). (DE 10, p. 25). During the hearing, the date of disability onset was amended from September 7, 2007 to May 31, 2009, and then later to September 15, 2009. (DE 10, pp. 30, 141-142).

On July 29, 2010, the ALJ issued an unfavorable decision regarding Plaintiff's DIB and SSI requests. (DE 10, pp. 7-20). Determining that Plaintiff was not disabled within the meaning of the Act, the ALJ set forth the following findings of fact and conclusions of law:

> (1) The claimant meets the insured status requirements of the Act through June 30, 2013.
>
> (2) The claimant has not engaged in substantial gainful activity ("SGA") since September 15, 2009, the amended alleged disability onset date.
>
> (3) The claimant has the following severe impairments: diabetes mellitus, a formerly fractured hip repaired with metal plates, and major depressive disorder. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1.
>
> (4) The claimant has the residual functional capacity ("RFC") to lift and/or carry 10 pounds occasionally and 5 pounds frequently; stand and/or walk up to 2 hours; sit up to 8 hours; limited reaching, pushing or pulling; frequent

climbing, balancing, stooping, crouching and crawling; and occasional
kneeling. The claimant is able to understand, remember, and carry out short,
simple instructions; make judgments on simple work-related decisions; and
have occasional contact with the general public, co-workers, and supervisors.

(5) The claimant is unable to perform any past relevant work.

(6) The claimant was 34 years old on the alleged disability onset date, which is
defined as a younger individual aged 18-44.

(7) The claimant has at least a high school education and is able to communicate
in English.

(8) Transferability of job skills is not material to the determination of disability
because using the Medical-Vocational Rules as a framework supports a
finding that the claimant is "not disabled," whether or not the claimant has
transferable job skills.

(9) Considering the claimant's age, education, work experience, and RFC, there
are jobs that exist in significant numbers in the national economy that the
claimant can perform.

(10) The claimant has not been under a disability, as defined in the Act, from
September 15, 2009, through the date of this decision.

(DE 10, pp. 12-20). On January 6, 2012, the Appeals Counsel denied Plaintiff's request for

review. (DE 10, pp. 1-3).

Plaintiff timely brought this action before the Court on March 9, 2012. (DE 1). Defendant

answered Plaintiff's complaint and filed the SSA administrative record on May 28, 2012. (DE 9;

DE 10). The following day, the Magistrate Judge ordered Plaintiff to file a motion for judgment

on the administrative record and ordered Defendant to file a response. (DE 11).

On June 19, 2012, Plaintiff filed a motion for judgment on the administrative record. (DE

12-1). Plaintiff requests that the decision of the ALJ be reversed and that Plaintiff be awarded

DIB and SSI, or alternatively reverse the ALJ's decision and remand this case to the

Commissioner for further consideration. (DE 12-1, pp. 13-14). Defendant filed a response on

July 18, 2012. (DE 13). Plaintiff timely filed a reply on July 30, 2012. (DE 14-1). This matter is now properly before the Court.

## II.  REVIEW OF THE RECORD

### A.  MEDICAL EVIDENCE

As developed through the medical record and hearing testimony, Plaintiff claims the following impairments: a seizure disorder since birth, type 2 diabetes, a fractured hip repaired with metal plates, chest pains, sharp pains in his feet and ankles, numbness in his feet and legs, pain in his knee, loss of hearing in one ear, a learning disability, and major depressive disorder.

Karin Fram, M.D. ("Dr. Fram") from Lapeer Regional Hospital, in Lapeer, Michigan, treated Plaintiff from May 29, 2003 to September 8, 2006. (DE 10, pp. 281-300). In a letter dated May 29, 2003, Dr. Fram documented that Plaintiff was able to walk without difficulty, had a seizure disorder since birth, and had most recently suffered a seizure on October 31, 2002. (DE 10, pp. 290-291). Farther along in the letter, Dr. Fram noted  that Plaintiff's seizures were accompanied by "dizziness described as lightheadedness, losing motor skills, inability to talk, shakes in the hands, postictal fatigue[2] and tiredness with tendency to sleep for many hours after that." (DE 10, p. 290). During Dr. Fram's appointment with Plaintiff on June 6, 2003, Dr. Fram noted that Plaintiff's chief complaint was seizures, Plaintiff's MRI was normal, and Plaintiff's EEG was borderline abnormal. (DE 10, pp. 253, 293-294).

From July 8, 2003 to September 8, 2006, Plaintiff only reported one seizure to Dr. Fram. (DE 10, pp. 283-289). This seizure occurred on August 29, 2005 and resulted in a motor vehicle accident ("MVA") and a fractured hip. (DE 10, p. 284). Dr. Fram noted that Plaintiff's seizure

---

[2] Fatigue occurring after a seizure. *See* Elsevier Saunders, <u>Dorland's Illustrated Medical Dictionary</u> 1502 (32nd ed. 2012).

disorder was controlled with medication, such as Depakote ER, Depakote, Topamax, Dilantin, and Phenobarbital. (DE 10, pp. 283-292). Dr. Fram also noted that Plaintiff was not compliant with his seizure medication in April 2006. (DE 10, p. 283).

On August 29, 2005, Kenneth Davenport, M.D. ("Dr. Davenport") of Orthopaedic Surgery Associates of Marquette, P.C., in Marquette, Michigan, treated Plaintiff for injuries sustained in a MVA. (DE 10, pp. 342, 347). In Dr. Davenport's discharge summary, he noted that Plaintiff's past medical history[3] included: a history of seizure disorder treated by Depakote, type two diabetes, and hyperlipidemia.[4] (DE 10, p. 343). According to Dr. Davenport's September 15, 2005 notes, Plaintiff had a seizure while driving on August 29, 2005. (DE 10, p. 347).

The day after Plaintiff's MVA, on August 30, 2005, Larry Lewis, M.D. ("Dr. Lewis") from the Marquette General Hospital Trauma Service, in Marquette, Michigan, examined Plaintiff to assess his seizure disorder. (DE 10, pp. 345-346). Plaintiff told Dr. Lewis that he had suffered seizures since infancy, had taken different anticonvulsant medications to control his seizures, had approximately two seizures per year, and his last known seizure was in April 2004. (DE 10, p. 345).[5]

On December 23 and 29, 2008, Plaintiff was treated at Stonecrest Medical Center in Smyrna, Tennessee, for chest pains and complications arising from his diabetes. (DE 10, p. 213).

---

[3] It is unclear from Dr. Davenport's notes whether Plaintiff self-reported this medical history or whether Dr. Davenport obtained this information from objective medical records.

[4] Hyperlipidemia refers to high concentrations of lipids in the plasma. *See* Elsevier Saunders, Dorland's Illustrated Medical Dictionary 891 (32nd ed. 2012).

[5] Although not pertinent to Plaintiff's claims of error, the medical history regarding Plaintiff's fractured hip is provided herein. After the MVA, Plaintiff's fractured hip was repaired with metal plates. (DE 10, p. 351). Plaintiff underwent physical therapy at the Mather Nursing Home in Ishpeming, Michigan from September 7, 2005 to October 7, 2005. (DE 10, pp. 365, 370). On September 27, 2005, Catherine Kroll, D.O. ("Dr. Kroll") of Gwinn Sawyer Medical Center in Gwinn, Michigan, opined that Plaintiff's fractured hip would prevent him from working for at least several months but was unsure how long this inability would last. (DE 10, p. 415).

Plaintiff was admitted on December 23, 2008 after complaining about a headache and a tingling in his left arm. (DE 10, pp. 426-443). Plaintiff reported he had not taken his diabetes medication. (DE 10, p. 428). Clark Archer, M.D. ("Dr. Archer") treated Plaintiff during this visit, and Dr. Archer's clinical impression was hyperglycemia.[6] (DE 10, p. 429). A CT scan during this visit was unremarkable. (DE 10, p. 441).

Plaintiff was next admitted to Stonecrest Medical Center on December 29, 2008 after complaining about chest pain. (DE 10, pp. 444-466). The records indicate Plaintiff was prescribed Depakote for his epilepsy and insulin for his diabetes. (DE 10, p. 445). Plaintiff was again noted as being noncompliant with his medication for one year.[7] (DE 10, pp. 445, 447). Michael Anderson, M.D. ("Dr. Anderson") diagnosed Plaintiff with chest pain and high blood sugar. (DE 10, p. 451).[8]

Plaintiff was admitted to StoneCrest Medical Center on August 15, 2009 after complaining about being lightheaded. (DE 10, pp. 469-489). Although Plaintiff was prescribed Depakote, the medical records indicate that Plaintiff had not taken his prescribed medication for two years. (DE 10, pp. 470, 478, 481). The records from this visit mention that Plaintiff's epilepsy is "connected through the heart" and that Plaintiff's last "cardiac arrest" had occurred four years ago; i.e. in 2005. (DE 10, p. 481). Erik Motsenbocker's, M.D. ("Dr. Motsenbocker") clinical impression was hyperglycemia and poorly controlled diabetes. (DE 10, p. 482). A CT

---

[6] Hyperglycemia refers to abnormally high glucose levels in the blood, such as diabetes mellitus. *See* Elsevier Saunders, Dorland's Illustrated Medical Dictionary 889 (32nd ed. 2012).

[7] It is unclear whether the medical report indicates noncompliance with Plaintiff's diabetes medication, anticonvulsant medication, or both.

[8] Plaintiff's chest exams during this visit showed that his heart and lungs were normal. (DE 10, p. 464). Plaintiff's ECG during this visit was also normal aside from showing sinus tachycardia, meaning a heart rhythm of more than 100 beats per minute. (DE 10, p. 465).

taken during this visit was unremarkable, and Plaintiff's sinus rhythm and ECG were normal. (DE 10, pp. 487-488).

On March 10, 2009, Plaintiff was admitted to StoneCrest Medical Center after complaining about chest pain, light headedness, and difficulty seeing. (DE 10, pp. 492-537). Plaintiff stated he was compliant with his prescribed medication, which included Depakote. (DE 10, pp. 493, 506, 508). However, another page of the report from this visit notes that Plaintiff did not take his medications because he could not afford them. (DE 10, p. 494). Quoc Nguyen, M.D. ("Dr. Nguyen") treated Plaintiff during this visit; his clinical impression was hyperglycemia. (DE 10, p. 498). Sattar Hadi, M.D. ("Dr. Hadi") also treated Plaintiff during this visit. Plaintiff told Dr. Hadi that he had experienced a previous "cardiac insult" after seizures. (DE 10, p. 506). A CT and a chest exam during this visit showed that Plaintiff's heart and lungs were normal and that his lungs were free of masses or obstructions. (DE 10, pp. 524-525). Plaintiff's ECG during this visit was also normal and had a normal sinus rhythm. (DE 10, p. 529). After this visit, Plaintiff was prescribed Depakote ER for his seizures. (DE 10, p. 547).

According to records from the Rutherford County Department of Health in Murfreesboro, Tennessee, on December 10, 2009, Plaintiff told a resident nurse he had not had a seizure for four years; i.e. in 2005, and that he was prescribed insulin and Depakote but had been noncompliant for two years. (DE 10, pp. 627/644, 634/644).[9] According to a March 3, 2010 report, Plaintiff told the resident nurse that he was currently taking Depakote ER and that his last seizure had occurred about five years prior; i.e. in 2005. (DE 10, p. 623/644).[10]

---

[9] Page numbers 627/644 and 634/644 are not Bates Stamped. They are referenced by the page numbers assigned by the CMECF.

[10] Page number 623/644 was not Bates Stamped. It is referenced by the page number assigned by the CMECF.

### B. CONSULTATIVE ASSESSMENTS

After Plaintiff requested DIB and SSI, the SSA ordered Plaintiff to undergo physical and mental consultative exams.

On September 30, 2008, Mark A. Deskovitz, Ph.D., L.P. ("Dr. Deskovitz") performed a consultative psychological assessment on Plaintiff. (DE 10, pp. 302-307). During the exam, Plaintiff reported the following maladies: epilepsy, type 1 diabetes, loss of hearing in his left ear, arthritis in his knee, a loss of sensitivity in his feet and ankles, sharp pains in his feet, a learning disability, trouble with comprehension, depression, and suicidal thoughts. (DE 10, pp. 302-303). Plaintiff claimed his last seizure had been three years prior; i.e. in 2005, when he fell and broke his hip.[11] (DE 10, p. 302). Plaintiff reported that he had trouble affording his medications which included: Depakote, Lipitor, Actos, Glipizide, Novolin, over-the-counter arthritis treatment, and aspirin. (DE 10, p. 302).

Dr. Deskovitz reported that Plaintiff had a "tendency to somewhat exaggerate his symptomology. It is clear that the claimant is under distress; however, he endorsed many symptoms to make sure that he was being heard." (DE 10, p. 304). Dr. Deskovitz found that Plaintiff had a normal gait, was oriented times three,[12] could follow simple work instructions, could complete routine tasks, and had a Global Assessment of Functioning ("GAF") score of 55.[13] (DE 10, pp. 304, 306-307). Dr. Deskovitz also noted that Plaintiff "met the criterion for a

---

[11] The medical records indicate that Plaintiff fractured his hip in a MVA after suffering a seizure.

[12] Oriented times three means a patient can state who he is, where he is, and what time it is.

[13] The GAF scale, ranging from 0 to 100, indicates an individual's mental health on a sliding continuum. A score between 41 and 50 indicates serious symptoms or serious functioning impairments in social, occupational, or school functioning. Moderate symptoms or moderate functioning impairments are indicated by a score between 51 and 60. Such individuals might have occasional panic attacks, few friends, or conflicts with peers and co-workers. *See*

diagnosis of major depressive disorder" and alcohol abuse and that the pressure of a working environment might result in decompensation.[14] (DE 10, p. 306). Dr. Deskovitz further reported that mental health treatment would reduce the risk of decompensation and make Plaintiff employable. (DE 10, p. 306).

Plaintiff was referred to Bret Bielawski, D.O. ("Dr. Bielawski") for a consultative medical evaluation on October 8, 2008. (DE 10, p. 309). During the assessment, Plaintiff reported that his last "grand mal" seizure was three years ago; i.e. in 2005, and that he was still taking Depakote to control his seizures. (DE 10, pp. 309, 311). Plaintiff's neurological exam was unremarkable. (DE 10, p. 311).[15]

Disability Examiner Janis Canon, M.D. ("Dr. Canon") completed Plaintiff's physical RFC assessment on October 28, 2008. (DE 10, pp. 312-319). Dr. Canon found that Plaintiff could occasionally lift or carry fifty pounds, frequently lift or carry twenty-five pounds, stand or walk about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, push or pull without limits, frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (DE 10, pp. 313-314). Dr. Canon noted that Plaintiff could never climb ladders, ropes, or scaffolds or work at heights or with machinery due to Plaintiff's epilepsy. (DE 10, pp. 314-316). Dr. Canon noted no manipulative, visual, or communicative limitations and no environmental

---

*Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 (6th Cir. 2006); *see also Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

[14] Decompensation generally refers to progressive personality disintegration. *See* Elsevier Saunders, <u>Dorland's Illustrated Medical Dictionary</u> 475 (32nd ed. 2012).

[15] Dr. Bielawski also noted that Plaintiff could stand for four hours and walk for about thirty minutes and that Plaintiff had "moderate difficulty heel and toe walking" and "walks with a small stepped ginger gait as if he was walking on something uncomfortable without the use of an assist device and without his socks and shoes." (DE 10, pp. 310-311). After Plaintiff told Dr. Bielawski that another party had suggested Plaintiff might have heel spurs, Dr. Bielawski noted the possibility of heel spurs. (DE 10, pp. 310-311).

limitations aside from working with machinery and heights. (DE 10, pp. 315-316). In her assessment, Dr. Canon noted that Plaintiff's statements regarding the severity of his symptoms were not consistent with the medical evidence, and she accordingly found Plaintiff's statements partially credible. (DE 10, p. 317).

Medical Consultant Joe DeLoach, Ph.D. ("Dr. DeLoach") completed Plaintiff's mental RFC assessment on November 3, 2008. (DE 10, pp. 320-337). Dr. DeLoach concluded that Plaintiff had an adequate memory, moderately limited ability to concentrate, adequate social interaction skills, the ability to adapt to the environment, the capacity to perform simple tasks on a sustained basis, and motivational problems. (DE 10, p. 322). Dr. DeLoach disagreed with Dr. Deskovitz's suggestion that Plaintiff's employment might result in decompensation. (DE 10, p. 322). First noting that there was insufficient evidence from which to draw this inference, Dr. DeLoach pointed out that Plaintiff had not shown signs of decompensation or sought mental health treatment. (DE 10, p. 322). Dr. DeLoach also completed Plaintiff's Psychiatric Review Technique on November 3, 2008. (DE 10, pp. 324-337). In this report, Dr. DeLoach agreed with Dr. Deskovitz that Plaintiff met the criteria for alcohol abuse and severe, recurrent major depressive disorder. (DE 10, pp. 327, 332). Dr. DeLoach noted that Plaintiff had mild limitations regarding activities of daily living, moderate limitations regarding social functioning and maintaining concentration, persistence, or pace, and he found that Plaintiff had not experienced episodes of decompensation of extended duration. (DE 10, p. 334).

In accordance with DDS policy, when Plaintiff requested a reconsideration of his DIB and SSI applications, different disability examiners reviewed Plaintiff's case record. Frank R. Pennington, M.D. ("Dr. Pennington") reviewed Plaintiff's medical records and Dr. Canon's physical RFC assessment; he affirmed Dr. Canon's assessment on December 9, 2008. (DE 10, p.

338). Andrew J. Phay, Ph.D. ("Dr. Phay") reviewed Plaintiff's medical records and Dr. DeLoach's mental RFC assessment; he affirmed Dr. DeLoach's assessment on December 9, 2008. (DE 10, p. 339).

### C. PLAINTIFF'S TESTIMONY

During the July 9, 2010 hearing, Plaintiff testified that his most recent seizures occurred in December 2009 and on August 29, 2005. (DE 10, p. 36). Plaintiff testified that he filed for disability benefits in 2008 because he had experienced "severe cramping and tingling sensation in [his] toes to where they were burning, itching, and cramping up . . . " and interfering with his sleep. (DE 10, pp. 44-45). At Mr. Downard's prompting, Plaintiff stated that his feet problems are related to his diabetes. (DE 10, p. 50).

Plaintiff testified that he worked two part-time jobs from May 31, 2009 to September 2009. (DE 10, pp. 31-33). One job involved packaging compact disks, and the other consisted of preparing salads. (DE 10, pp. 31-33). The jobs required Plaintiff to lift between five and six pounds and to stand four to eight hours. (DE 10, p. 33). According to Plaintiff, he was capable of working full time in September 2009. (DE 10, p. 34). Plaintiff then testified that he would not have been able to work full-time starting in Mid-September or October 2009 because his ankle swelled regularly, his hip locked up on some days, and he had no feeling from his toes to his knees. (DE 10, pp. 35, 42). Plaintiff testified that he had not sought medical attention for the numbness in his legs. (DE 10, p. 36).

Plaintiff admitted he did not have problems using his hands, but stated that he had problems using his feet, right knee, and left hip. (DE 10, pp. 40, 55). Plaintiff admitted he could take care of his basic needs, use public transportation, wash himself, cook, and do laundry. (DE 10, pp. 40-41). When asked what he did during the day, Plaintiff testified that he looked up

11

medical information online, checked his email, and played computer games. (DE 10, p. 41).

Plaintiff testified that he spends most of his time on the floor because if he sits for longer than

twenty minutes it hurts to stand up and he must then wait ten to fifteen minutes to begin walking.

(DE 10, p. 41). Plaintiff stated that he could stand for thirty minutes at most and about four hours

in an eight-hour workday. (DE 10, p. 53).

### D. VOCATIONAL EXPERT'S TESTIMONY

The VE testified that Plaintiff's past work experience included:

> (1) Work as a hand-packager at a light level. Hand-packagers are generally classified as medium, unskilled work.
>
> (2) Work as a fast-food worker, which is classified as light and unskilled work.
>
> (3) Work as a cook helper, which is classified as medium and unskilled work.
>
> (4) Work as a loader and unloader, which is classified as medium and semiskilled with no transferrable skills.

(DE 10, pp. 43-44). The ALJ asked the VE whether past work was available for an individual

Plaintiff's age, with the same educational background and work history, and with Dr. Canon's

physical RFC assessment and Dr. DeLoach's mental RFC assessment at a light level. (DE 10, pp.

56, 312-323). The VE testified that the fast-food work and hand-packager work as performed by

Plaintiff would be available. (DE 10, p. 56).

The ALJ next asked the VE whether past work was available for an individual who could

sit up to six hours a day, stand up to four hours a day with the use of a cane, sit and stand at will,

frequently push and pull with the upper extremities, occasionally climb, balance, stoop, crouch,

kneel, and crawl, carry out short and simple instructions, and make judgments on simple work-

related decisions. (DE 10, p. 56). According to the VE, no past work was available. (DE 10, p.

56). When the hypothetical included lifting ten pounds occasionally and five pounds frequently, the VE testified that other work would likely be precluded because the worker would only be free to use one arm if he was concurrently using a cane. (DE 10, p. 57).

The ALJ posed a third hypothetical, changing the postural limitations so that the individual could sit up to eight hours a day and stand up to two hours a day. (DE 10, p. 57). The VE testified that no past work would be available but that sedentary work was a viable option. (DE 10, p. 57). Examples of sedentary, unskilled work for individuals with a limited education include interviewers, information clerks, and data entry clerks. (DE 10, p. 57).

If Plaintiff's testimony was found credible, the VE testified that no work would be available for Plaintiff, mainly because Plaintiff claimed that he needed to lie down during the normal workday. (DE 10, p. 58).

## III. CONCLUSIONS OF LAW

### A.  STANDARD OF REVIEW

This Court reviews decisions of the Commissioner pursuant to 42 U.S.C. §§ 405(g) and 1383(c). The Commissioner's decision shall be affirmed if it is "supported by substantial evidence and was made pursuant to proper legal standards." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013), reh'g denied (May 2, 2013). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' . . . even if substantial evidence would also have supported the opposite conclusion." *Id*. Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Failure to follow proper legal standards "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Gayheart*, 710 F.3d at 374.

**B. PROCEEDINGS AT THE ADMINISTRATIVE LEVEL**

To succeed on a request for DIB or SSI, the claimant must prove he is "disabled" within the meaning of the Act. 42 U.S.C. §§ 423(a)(1)(E), 1381(a). An individual is disabled if he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In proceedings before the SSA, the following five-step test is used to determine whether an individual meets the disability requirement:

(1) If the claimant is doing SGA, the claimant is not disabled.

(2) If the claimant's physical or mental impairment, or combination of impairments, is not severe or does not meet the duration requirement, the claimant is not disabled.

(3) If the claimant's impairment(s) meets or equals a listed impairment in 20 C.F.R. pt. 404, subpt. P, app. 1, the claimant is presumed disabled, and the inquiry ends.

(4) Based on the claimant's RFC, if the claimant can still perform past relevant work, the claimant is not disabled.

(5) If the claimant's RFC, age, education, and work experience indicate that the claimant can perform other work, the claimant is not disabled.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

The claimant bears the burden of proof for the first four steps, but upon proving these steps, the burden shifts to the SSA at step five. *Carrelli v. Comm'r Of Soc. Sec.*, 390 F. App'x 429, 435 (6th Cir. 2010). The SSA may meet its burden at step five by providing evidence of a "significant number of jobs in the economy that accommodate the claimant's RFC and vocational profile." *Id.* Unless the claimant is significantly limited by a nonexertional impairment, the SSA

may use the Medical-Vocational Guidelines or "grids" found in 20 C.F.R. pt. 404, subpt. P, app. 2 to meet its burden at step five. *Kyle v. Comm'r Of Soc. Sec.*, 609 F.3d 847, 855 (6th Cir. 2010). The grids are considered along with the claimant's RFC, age, education, and work experience to determine if other work is available. *Id*.

## C. PLAINTIFF'S STATEMENT OF ERRORS

At issue is (1) whether the ALJ complied with Social Security Ruling ("SSR") 96-7p in assessing Plaintiff's seizure-related testimony; (2) whether the ALJ followed SSR 85-28 in determining that Plaintiff's seizure disorder is non-severe; and (3) whether the ALJ properly assessed Plaintiff's RFC. (DE 12-1, pp. 7, 13).

### 1. ASSESSING PLAINTIFF'S TESTIMONY UNDER SSR 96-7P

In determining whether an individual is disabled, his symptoms are taken into account to the extent that they are reasonably consistent with objective medical evidence and other evidence, such as the individual's statements, prescribed treatment, daily activities, and efforts to work. 20 C.F.R. §§ 404.1529(a), 416.929(a); SSR 96-7p. Symptoms are evaluated in a two-step process. First, medical evidence must show the existence of a medically determinable impairment "which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 96-7p. Second, the intensity and persistence of the symptoms are evaluated using all available evidence to determine the extent to which they limit the individual's ability to work. 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96-7p. Factors to consider when evaluating non-medical evidence include: (1) daily activities; (2) location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) type, dosage, effectiveness, and side effects of medication taken to alleviate pain or other symptoms; (5) other treatment used to relieve pain or other symptoms;

(6) other measures used to relieve pain or other symptoms; and (7) other factors concerning the individual's functional limitations and restriction due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p.

Credibility determinations rest with the ALJ, and "[a]s long as the ALJ cite[s] substantial, legitimate evidence to support his factual conclusions, we are not to second-guess." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713-14 (6th Cir. 2012). The ALJ's determination must be "grounded in the evidence," not merely an "intangible or intuitive notion." SSR 96-7p. Consistency is a strong indication of credibility, but inconsistency does not automatically render an individual's statements non-credible. SSR 96-7p. When presented with inconsistent evidence, the ALJ weighs all of the evidence in the record to determine whether a disability determination can be made from the information present. 20 C.F.R. § 404.1527(c)(2). An ALJ may discount the claimant's credibility upon discovering "contradictions among medical reports, claimant's testimony, and other evidence." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 543 (6th Cir. 2007) (quoting *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997)). However, because symptoms "may vary in their intensity, persistence, functional effects, and may worsen or improve over time," the ALJ should seek an explanation for inconsistencies. SSR 96-7p.

In the present matter, the ALJ first acknowledged that Plaintiff has a seizure and epilepsy disorder accompanied by headaches. (DE 10, p. 12). The ALJ next determined that Plaintiff's seizure-related testimony may not be completely credible because it is internally inconsistent as well as inconsistent with the medical record. (DE 10, pp. 12-13). As required by SSR 96-7p, the ALJ supported his credibility determination with evidence from the case record. The ALJ began by referring to a questionnaire Plaintiff completed in August 2008 in which Plaintiff indicated that his last seizure had occurred in August 2005 and that he was taking Depakote twice a day to

control his seizures. (DE 10, pp. 12-13, 178-182). However, in a different section of the same questionnaire Plaintiff also indicated that his last seizure had occurred sometime in 2008 and that he experienced seizures every four months to one year. (DE 10, pp. 13, 179). This alleged frequency of seizure activity is contradicted by notes from Plaintiff's consultative assessment with Dr. Deskovitz on October 30, 2008 during which Plaintiff stated his last seizure was in 2005. (DE 10, pp. 13, 302).

Plaintiff's hearing testimony casts further doubt on Plaintiff's credibility. Although Plaintiff testified at his hearing that his most recent seizure occurred in 2009 (DE 10, pp. 13, 36), treatment notes from the Rutherford County Department of Health dated March 2010 show that Plaintiff reported his last seizure was in 2005. (DE 10, pp. 13, 623/644).[16] After pointing out the inconsistency in Plaintiff's reported seizure dates and seizure frequency, the ALJ also considered that Plaintiff had an unremarkable MRI in December 2008, an unremarkable CT in December 2009, and had previously used Dilantin to control his seizures, (DE 10, pp. 13, 289-291). As Plaintiff's assertions regarding the frequency of his seizures is contradicted by his own testimony and the medical evidence in the record, the ALJ's credibility determination is well-grounded in the record and is far from an intuitive notion.

## 2. DETERMINING THE SEVERITY OF PLAINTIFF'S IMPAIRMENTS UNDER SSR 85-28

Step two of the five-step disability test discussed *supra* at 14 requires a finding from the medical evidence that the claimant's impairments, individually or combined, are so *severe* that they inhibit the claimant from engaging in SGA. 20 C.F.R. §§ 404.1520, 404.1521, 416.920(c), 416.921; SSR 85-28. A condition or combination of conditions is "non-severe" if they are only

---

[16] Page number 623/644 was not Bates Stamped. For present purposes it is referenced by the page number assigned by the CMECF.

slight abnormalities and only have a minimal effect on the plaintiff's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1521(a), 416.921(a); SSR 85-28. Basic work activities include "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment, responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting." SSR 85-28. At this stage, the ALJ does not consider the claimant's age, education, or work experience. 20 C.F.R. §§ 404.1520(c), 416.920(c).

The ALJ found that Plaintiff suffered from the following severe impairments: diabetes mellitus, a formerly fractured hip repaired with metal plates, and major depressive disorder. (DE 10, p. 12). After noting that Plaintiff's seizure-related information may not be entirely credible, the ALJ determined that Plaintiff's seizure disorder was non-severe in that it only minimally affected Plaintiff's ability to perform basic work activities. (DE 10, p. 13).

Plaintiff claims that this non-severe determination is in error and was based on faulty assessments of the medical evidence and Plaintiff's testimony. (DE 12-1, p. 7). In support of his argument, Plaintiff states that he lost his driver's license in 2002 because of his seizure disorder, refers to an abnormal EEG from 2003, and notes a brief history of seizure-related problems and changes in his anticonvulsant medication. (DE 12-1, pp. 10-13).[17]

Despite Plaintiff's contentions to the contrary, substantial evidence in the record supports the ALJ's determination that Plaintiff's seizure disorder is non-severe when considered individually and when combined with Plaintiff's other impairments. Stated *supra* at p. 17, the

---

[17] Though Plaintiff presented several issues before this Court, Defendant only responded to this single claim of error. (DE 13, p. 9). Defendant supports the ALJ's "non-severe" assessment because Plaintiff's testimony is inconsistent and alternatively because Plaintiff reported infrequent seizure activity. (DE 13, pp. 9-11).

ALJ properly determined that Plaintiff's seizure-related testimony, estimating seizures every four months to one year, may not be entirely credible. According to the medical records, Plaintiff's seizures appear to be infrequent; Plaintiff reported two seizures between 2005 and 2012. (DE 10, pp. 285-289). Further, Plaintiff's seizure disorder has been adequately controlled with prescribed medications, including Depakote ER, Depakote, Topamax, Dilantin, and Phenobarbital. (DE 10, pp. 283-292). Aside from weight gain in 2005, Plaintiff does not appear to have adverse reactions to his seizure medication. (DE 10, pp. 18, 40, 285-286, 289). It also does not appear that Plaintiff's seizure disorder is preventing him from obtaining a driver's license as Plaintiff testified that a neurologist could remove his current driving restrictions. (DE 10, p. 37). Based on the infrequency of Plaintiff's seizures and Plaintiff's ability to control his seizures with medication, the ALJ had substantial evidence for the non-severe determination.

### 3. ASSESSING PLAINTIFF'S RFC

When addressing the fourth and fifth steps, the ALJ assesses the claimant's RFC to determine what the claimant can still do despite his limitations and whether the claimant can perform past work (step four) or other work (step five). 20 C.F.R. 404.1520(a)(4)(iv)-(v), 416.920(a)(4)(iv)-(v). All of the claimant's impairments, severe and non-severe, mental and physical, exertional and nonexertional, must be considered. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(2), 416.920(e), 416.945. The ALJ considers the medical information in the case record, including the claimant's medical history, consultative reports, other medical reports and statements, in addition to descriptions and observations about the claimant's limitations from the claimant, his family, and others. 20 C.F.R. §§ 404.1545(a)(3), 416.945(3). Medical evidence is given different weight based on the relationship between the patient and examiner. In general, the ALJ gives greater weight to evaluations from treating physicians and sources who have

actually examined the claimant. 20 C.F.R. §§ 404.1527(d)(1)-(2), 416.927(c)(1)-(2); *Gayheart*, 710 F.3d at 375-76. If the Commissioner chooses not to put great weight on the treating provider's evidence, the Commissioner must put forth a good reason for so doing. *Gayheart*, 710 F.3d at 376. Non-examining sources are considered insofar as their opinions are supported by explanations, and greater weight is given to opinions that are consistent with the record as a whole. 20 C.F.R. §§ 404.1527(d)(3)-(4), 416.927(c)(3)-(4). The ALJ must consider, but is not bound by, the findings of the State agency medical and psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(e)(2)(i).

The ALJ ultimately determined that Plaintiff's physical RFC included the "capacity to lift and/or carry 10 pounds occasionally and 5 pounds frequently; stand and/or walk up to 2 hours; sit up to 8 hours; limited reaching, pushing or pulling; frequent climbing, balancing, stooping, crouching and crawling; and occasional kneeling. . . ." (DE 10, p. 14). Plaintiff's mental RFC included the ability to "understand, remember and carry out short, simple instructions; make judgments on simple work-related decisions; and have occasional contact with the general public, co-workers and supervisors." (DE 10, p. 14).

Plaintiff claims the ALJ erred in withholding the following limitations from Plaintiff's RFC: seizure-related limitations, which include not being able to operate motor type vehicles or work near or with hazardous and moving machinery; having a blood sugar level at or above 400; difficulty interacting in a work environment due to decompensation; needing to avoid exposure to the public; and having a special education background. (DE 12-1, p. 13).

### a. PHYSICAL RFC

The ALJ's assessment of Plaintiff's physical RFC is supported by substantial evidence. While considering the record as a whole, the ALJ specifically referred to the following sources

when noting Plaintiff's physical impairments: (1) Plaintiff's testimony, (2) medical records from March 1, 2010 regarding a work-related back injury, (3) a medical record from late March 2010 noting that Plaintiff cancelled a doctor's appointment because Plaintiff was starting a job, (4) medical treatment notes, (5) notes from a consultative exam with Dr. Bielawski, (6) a RFC assessment by DDS physician Dr. Canon, and (7) a reconsideration of Dr. Canon's RFC assessment by DDS physician Dr. Pennington. (DE 10, pp. 17-18). Although the ALJ did not specifically address the medical records provided by Dr. Fram, a treating physician at the time Plaintiff first filed for DIB and SSI in 2005, the information provided by Dr. Fram comports with and further supports the ALJ's determination. (DE 10, pp. 281-300).

Following the dictates of SSR 96-7p, the ALJ found that Plaintiff's medically determinable impairments could reasonably cause the complained-of symptoms but that the intensity, persistence, and limiting effects of the symptoms were not credible as alleged by Plaintiff. (DE 10, p. 18). In support of this conclusion are the medical evidence in the record and Plaintiff's ability to perform many activities of daily living, including: playing on the computer daily, doing household chores, watching television, and calling a temporary work agency daily in search of employment. (DE 10, pp. 18-19).

The ALJ appropriately determined that Plaintiff's RFC was not further limited by Plaintiff's seizure disorder. As referenced *supra* at pp. 17-19, the ALJ already questioned the credibility of Plaintiff's seizure-related testimony and determined that it minimally affected Plaintiff's ability to perform basic work functions. As supported by Dr. Fram's notes, Plaintiff's seizures occur infrequently, and Plaintiff's seizure-disorder is controllable with medication, generally without side effects. (DE 10, p. 18). Plaintiff has worked multiple jobs, and his life-long seizure disorder does not appear to have inferred in Plaintiff's work performance or ability

21

to work. (DE 10, pp. 18, 35, 42, 144-145, 188-194, 224, 238). Reasons for Plaintiff's terminations include a lack of transportation to work, failing to perform a safety check, and lack of performance. (DE 10, pp. 46-47).

Although Dr. Canon's physical RFC assessment in-part supports Plaintiff's claims to machinery limitations, the ALJ appropriately assigned little weight to Dr. Canon's RFC assessment and Dr. Pennington's concurring opinion after noting that they were inconsistent with the record and understated Plaintiff's impairments. (DE 10, pp. 17-18). Indeed, while Dr. Canon indicated that Plaintiff could not climb ladders, ropes, or scaffolds or work at heights or with machinery due to Plaintiff's epilepsy, the assessment also reflected that Plaintiff could lift or carry fifty pounds occasionally, twenty-five pounds frequently, and stand, walk, or sit for six hours in an eight-hour workday. (DE 10, pp. 314, 316). These findings are contrary to the ALJ's ultimate conclusion that Plaintiff's actual RFC was limited to carrying ten pounds occasionally, five pounds frequently, standing or walking up to 2 hours, and sitting up to eight hours. (DE 10, p. 14). Additionally, because Plaintiff testified that he would be able to obtain a driver's license upon finding a neurologist (DE 10, p. 37), a driving restriction on his RFC would be unfounded.

Furthermore, Plaintiff's own testimony supports the ALJ's conclusion that Plaintiff's diabetes does not limit Plaintiff's physical RFC. Plaintiff testified that when his blood sugar levels were high he felt fine and felt like he could "perform any type of job that [he] need[ed] to do to get work or get paid." (DE 10, p. 50).

### b. MENTAL RFC

The ALJ's decision regarding Plaintiff's mental RFC is similarly supported by substantial evidence. In addition to considering the case record, the ALJ noted: (1) Plaintiff's testimony, (2) questionnaires completed by Plaintiff's mother, (3) notes from a consultative psychological exam

with Dr. Deskovitz, (4) a mental RFC assessment and Psychiatric Review Technique by DDS consultant Dr. DeLoach, (5) and a reconsideration of Dr. DeLoach's mental RFC assessment by DDS consultant Dr. Phay. (DE 10, pp. 15-16).

Finding that Plaintiff had several mental health issues, the ALJ noted that the evidence did not substantiate the limitations alleged. (DE 10, p. 16). Factors weighing against the claimed severity of Plaintiff's mental limitations were: Plaintiff's habit of spending time on the computer, checking email, playing computer games, calling a temporary agency daily looking for work, not seeking mental health treatment, exaggerating his symptomology to Dr. Deskovitz, and findings that Plaintiff could follow simple instructions and perform routine tasks. (DE 10, p. 16).

The ALJ appropriately placed great weight on most of Dr. Deskovitz's opinions because Dr. Deskovitz actually examined Plaintiff and his findings were consistent with the medical evidence in the record. (DE 10, pp. 15-16). However, the ALJ did not adopt Dr. Deskovitz's suggestion that the pressures of employment may cause Plaintiff to decompensate. The only evidence suggestive of decompensation comes from Dr. Deskovitz, who opined that the "pressure of employment *may* result in decompensation." (DE 10, p. 306) (emphasis added). Dr. DeLoach, a DDS consultant, disagreed with Dr. Deskovitz's opinion because Plaintiff had not shown any signs of decompensation or sought professional help for his emotional problems. (DE 10, pp. 16, 322). Dr. DeLoach's assessment was confirmed by Dr. Phay, another DDS consultant. (DE 10, pp. 16, 339). Since the record does not contain episodes of past decompensation or attempts to obtain mental health treatment, the ALJ was justified in withholding the possibility of decompensation as a limitation on Plaintiff's mental RFC.

Further, the evidence in the record does not indicate that Plaintiff needs to avoid exposure to the public. Plaintiff's own testimony reveals that he enjoys spending time at the mall,

spending time with his friends, and talking to his friends on the phone or online. (DE 10, p. 197).

The ALJ also appropriately addressed the limitations flowing from Plaintiff's special education background by noting that Plaintiff's RFC included the ability to follow simple instructions, which is consistent with Dr. Deskovitz's findings. (DE 10, pp. 14, 306).

### IV. CONCLUSION

For the reasons stated above, the Magistrate Judge hereby **RECOMMENDS** that Plaintiff's Motion for Judgment on the Administrative Record (DE 12) be **DENIED** and the Commissioner's decision be **AFFIRMED**.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days from receipt of this Report and Recommendation within which to file with the District Court any written objections to the proposed findings and recommendations made herein. Any party opposing shall have fourteen (14) days from receipt of any objections filed regarding this Report within which to file a response to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation may constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 1111 (1986).

**ENTERED** this the 25th day of June, 2013,


/s/    Joe B. Brown
Joe B. Brown
United States Magistrate Judge